IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CLARENCE L. GARRIS,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 13-cv-847-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Clarence L. Garris seeks judicial review of the final agency decision denying his application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff applied for benefits in July, 2010, alleging disability beginning on his date of birth, May 17, 1981. (Tr. 20). After holding an evidentiary hearing, ALJ James E. Craig denied the application in a written decision dated March 21, 2012. (Tr. 20-30). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### Issues Raised by Plaintiff

Plaintiff raises the following points:

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 17.

1

1. The ALJ erred in not giving appropriate weight to the opinions of his treating psychiatrist, Dr. Chandra.

2. The ALJ erred in giving great weight to the opinions of state agency consultants and in giving little weigh to the opinion of Dr. Warshauer, a psychologist who examined plaintiff on behalf of the agency.

3. The ALJ erred in failing to account for plaintiff's hallucinations in his RFC assessment and in finding that plaintiff can perform jobs which occur in a noisy environment.

4. The analysis of plaintiff's credibility was faulty.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

2

significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520;** ***Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.**

If the answer at steps one and two is "yes," the claimant will automatically be

3

found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).  *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether Mr. Garris was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See,** ***Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).**  In reviewing for "substantial evidence," the entire administrative record is taken into consideration,

but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Craig followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. He found that plaintiff had severe impairments of schizophrenia, attention deficit hyperactivity disorder, and history of substance abuse. He further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that Mr. Garris had the residual functional capacity (RFC) to perform work at all exertional levels, with a number of nonexertional limitations. Plaintiff had no past relevant work. Based on the testimony of a vocational expert, the ALJ concluded that Mr. Garris was not disabled because he was able to do several jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

5

Plaintiff was born on May 17, 1981, and was 29 years old when he filed his application in 2010. (Tr. 128). A previous application had been denied in 2009. (Tr. 128). The ALJ reopened the prior denial. (Tr. 20).

Mr. Garris completed the ninth grade and had some additional training in carpentry. (Tr. 133). He had worked as a finishing machine operator, a cook in a fast food restaurant, and as a carpenter with the Jobs Corps program. (Tr. 148).

In a Function Report submitted in September, 2010, plaintiff said he was unable to work because of ADHD, a short attention span, and bad nerves. He said he could not handle pressure and did not "feel welcomed most of the time." He could not concentrate well. He had no problems with personal care. He did some housework, prepared meals, and shopped for food and household items. He was not taking any medicine at the time. He had taken medications in the past, but the side effects made him feel restless and "just terrible." (Tr. 139).

### 2. Evidentiary Hearing

Mr. Garris was represented by an attorney at the evidentiary hearing on March 7, 2012. (Tr. 37). At the beginning of the hearing, plaintiff's counsel explained that he had been working at a job through a vocational rehabilitation program, but the program ended in the Spring of 2010. While he was in the supporting program, his attendance problems were tolerated, but, after the program ended, he was fired for missing a day of work. (Tr. 38). Counsel also stated that plaintiff was living in a trailer with no electricity, had hitchhiked to the hearing location the night before, and had slept outside. (Tr. 39).

Plaintiff was staying in his brother's old trailer while his brother was in jail.

(Tr. 40). His brother might be going to prison for three years, so the landlord told him he has to leave so the trailer could be rented to someone else. He had "no clue" what he was going to do. (Tr. 46).

He last worked as a cook at Hardee's. He worked there for about nine months. He was fired for poor job performance and missing work. (Tr. 41-42).

He had been taking Abilify and some other medications, but was not taking any medication at the time of the hearing. The mental health facility where he was treated no longer had a sliding fee scale. He could not afford to pay to see Dr. Chandra, or his counselor. (Tr. 43-44).

Mr. Garris testified that he could not work because he had a hard time concentrating. It was hard for him to comprehend things and he got confused. (Tr. 44). He heard voices. The voices were "a bunch of nonsense." He heard the voices of "all kinds of people." Sometimes he heard his brother's voice. (Tr. 47-48). He had dropped out of high school because of the voices. (Tr. 48-49).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at all exertional levels, limited to no detailed or complex work, no exposure to moving machinery, unprotected heights or a noisy or distracting environment. He should have no contact with the public and only occasional contact with coworkers and supervisors. He was limited to three-step or less tasks with no fast pace and no straight quotas. He was limited to thing-oriented work . The VE testified that this person could do jobs that exist in significant numbers in the national economy.

7

Examples of such jobs are cleaner and preparer of electrical equipment, kitchen helper and hand packer. (Tr. 54-56).

### 3. Medical Treatment

The medical records reflect minimal treatment. Mr. Garris received mental health treatment at Egyptian Health Department beginning in March, 2009. At his initial assessment, it was noted that he been hospitalized in 2000 with a diagnosis of psychotic disorder, NOS. He had been prescribed psychotropic medication as a child. He said he "kinda" heard male and female voices. His mood was anxious and his affect was flattened. He was unemployed but was looking for work. He was also trying to get on SSI. He had recently quit drinking alcohol. He smoked marijuana. He did not have a primary care physician. He had been prescribed Ritalin as a child because he was hyperactive. Individual and group counselling were recommended, as well as medication management. This assessment was signed by a Qualified Mental Health Professional. (Tr. 222-246). Dr. Rakesh Chandra reviewed the assessment a few days later and indicated that he agreed with it. (Tr. 246).

In June, 2009, a counselor noted that Mr. Garris had been prescribed medication, which was improving his ability to concentrate. It is unclear when this medication was prescribed. He reported that "the voices really do not bother him." It was noted that he was "diagnosed with a severe mental illness." In the next three months, they were going to see if he could hold a job in a "supportive employment program." (Tr. 254).

The first documented visit with Dr. Chandra took place on July 9, 2009,

when plaintiff was seen for medication management. Plaintiff was "doing well on his medication." He reported no problems or difficulties. The diagnoses were schizophrenia, undifferentiated type in partial remission with medication, and ADHD from history. He was prescribed Abilify, Cogentin and Strattera. (Tr. 220).

On September, 29, 2009, a counselor noted that Mr. Garris was working part-time through Egyptian Health Department's supportive employment program. He said he thought he was "doing good." However, he had also stopped taking the medications that had been prescribed by Dr. Chandra. An appointment with Dr. Chandra was set up for him in October. He was to remain in the employment program for "job retention assistance." (Tr. 257).

Dr. Chandra saw plaintiff again in October, 2009. Plaintiff told Dr. Chandra that he did not want to take medication except for Adderall. Plaintiff stated that he had ADHD and Adderall is the only thing that helped him. Dr. Chandra discussed with him the fact that he has a schizophrenic disorder and "with amphetamines he could potentially get worse." Mr. Garris agreed to "try some medication." On mental status exam, Dr. Chandra concluded that he was hallucinating and delusional. However, his insight and judgment were "reasonably intact." He was prescribed Invega and Strattera, and was to return in three months. (Tr. 219). There is no record of another visit with Dr. Chandra.

In January, 2010, a counselor noted that Mr. Garris "hears voices but ignores them." He was again not taking any medication. He was getting more hours at work and felt good about working. He was not complaining about anxiety.

9

(Tr. 258-259). He had retained employment for over 90 days, and was discharged from Vocational Rehabilitation Services. However, he wanted to remain in "job retention services" for another 3 months to ensure that he was able to retain his job. (Tr. 260).

The next review date was March 12, 2010. A counselor noted that he "manages voices very well." He had completed treatment and no longer needed counseling intervention. (Tr. 261-262).

The only other medical treatment was an emergency room visit for a spider bite in July, 2011. Mr. Garris was "unable to sit still" and "moving constantly." In the "review of systems" section of the record, it was noted that his behavior was abnormal and this was said to be "very obvious." He denied regular use of medication, but said he had taken two Tylenol #4, which had been given to him by someone. A urine drug screen was positive for oxycodone, cannabinoids and opiates. The diagnosis was an abscessed spider bite. He was treated and released. (Tr. 319-324).

    4.    **Dr. Chandra's Opinions**

In December, 2010, Dr. Chandra completed a form entitled "Mental Residual Functional Capacity Assessment." He gave diagnoses of schizophrenia, undifferentiated, and ADHD. He rated plaintiff as markedly limited in a number of areas, including ability to understand and carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special instruction, and maintain socially appropriate behavior. Dr. Chandra wrote that Mr. Garris is "continuously distracted," cannot follow work

procedures, "constantly hears voices [and] converses with some of them," "fidgets constantly," and "laughs inappropriately at times."  (Tr. 315-318).

     **5.**     **Opinions of Consultative Examiner**

David J. Warshauer, Ph.D., performed two consultative examinations of Mr. Garris at the request of the agency.[3]

The first exam took place in June, 2009, and was done in connection with plaintiff's prior application. Mr. Garris stated that he was taking Abilify and Strattera as prescribed by Dr. Chandra. He said that Abilify was "for voices," but it made him feel tired and restless. The Strattera was for ADHD, but plaintiff said it did "nothing really" to help him. He also indicated that he had taken Adderall, which he had gotten from a friend, and it helped him focus. Mr. Garris stated that he heard voices all the time and "It's like I can read minds or hear people thinking. It's in my head but it's real." On mental status exam, Dr. Warshauer found that plaintiff was oriented in all four spheres and answered questions in a relevant and coherent manner. His affect was inappropriate at times in that he laughed for no reasons and at other times had a "quite flattened" affect. Dr. Warshauer felt that plaintiff was "actively hallucinating" and that his "auditory hallucinations are fairly constant." He noted that plaintiff showed agitation in that plaintiff got up and walked around the office a few times. Plaintiff also drew pictures all over his hand with markers during the exam. Dr. Warshauer diagnosed schizophrenia, undifferentiated type, and attention-deficit/hyperactivity disorder, combined type.

---

[3] Dr. Warshauer's reports are on the letterhead of Egyptian Health Department, but there is no indication that he participated in plaintiff's care at that institution.

11

He also made a "rule out" diagnosis of alcohol abuse. He assigned a current GAF score of 41-42, and suggested that a responsible adult payee be appointed if plaintiff were to be awarded benefits. (Tr. 327 -329).

Dr. Warshauer examined plaintiff again on September 24, 2010. Plaintiff had been discharged from jail on September 13, 2010. He had served 30 days for child endangerment for smoking cannabis around a minor. The child was the son of plaintiff's brother. He had also been assessed a fine of $1,800.00. He was going to work off half of the fine by hauling brush. Dr. Warshauer noted that plaintiff had worked part time for nine months at a fast food restaurant, but was fired in March, 2010, when a new manager took over. Plaintiff said that he was "distracted continuously and cannot stay focused on his work and therefore cannot keep up." He was not receiving any mental health treatment and not taking any medication because the state had ended its grant to Egyptian Health Department and he could not afford to pay the fee of $75.00 per session. Plaintiff stated that he heard voices, but "has learned now not to pay as much attention to them." He also said that he "holds conversations with people who are no longer present." On exam, he was oriented in all four spheres and answered questions in a relevant and coherent manner. He fidgeted "constantly" and "could not sit still."

Although it was not mentioned by either party or by the ALJ, it appears that at least one page is missing from Dr. Warshauer's second report. The last sentence on Tr. 283 reads "At times his affect is inappropriate as he might laugh or [. . . ]" The first sentence on Tr. 284 reads "[. . . ] opinion, actively hallucinating and I did speak with his mental health counselor, Leslie Merritt, who was working

12

with Clarence prior to his not being able to afford treatment, and she also was of the very definite opinion that he is experiencing auditory and visual hallucinations."

The report concludes with diagnoses of schizophrenia, undifferentiated type, attention-deficit/hyperactivity disorder, combined type, and rule out alcohol and cannabis abuse/dependence.

6.   **RFC Assessment**

In October, 2010, state agency consultant Donald Henson, Ph.D., evaluated plaintiff's mental RFC based upon a review of the records. He first completed a Psychiatric Review Technique Form.  He indicated that the "medical disposition" was based on the categories of organic mental disorders, affective disorders and substance addictions disorders.  He did not check the box for schizophrenic disorders, although he acknowledged that both Dr. Chandra and Dr. Warshauer diagnosed schizophrenia.  He also did not note that at least one page of Dr. Warshauer's October, 2010, report is missing.   (Tr. 209-302).

In the mental RFC assessment, Dr. Henson concluded that Mr. Garris was moderately limited in ability to carry out detailed instructions, maintain   attention and concentration, perform activities within a schedule, maintain regular attendance, be punctual, and interact with the general public.  He was not significantly limited in any other areas.  According to Dr. Henson, plaintiff had received mental health services for "ADDH," bipolar disorder and substance abuse. (Tr. 286 -288).  A second state agency psychologist, Dr. Heinrich, affirmed Dr. Henson's assessment in December, 2010.   According to Dr. Heinrich, plaintiff "has a history of ADHD, bipolar & polysubstance abuse."   (Tr. 312-314).

13

## Analysis

The Court agrees with plaintiff's assertion that ALJ Craig erred in weighing the medical opinions.

The ALJ gave Dr. Chandra's opinion little weight because the Egyptian Health records showed that plaintiff's condition improved with treatment and, at the time of his discharge, his goals were met, he was not taking any medication, and he had maintained employment for 90 days. (Tr. 28). He discussed Dr. Warshauer's reports at Tr. 27-28. The ALJ said that he gave Dr. Warshauer's GAF assessments little weight, but did not otherwise analyze his opinions. Lastly, he gave great weight to the opinions of the state agency consultants because there was little evidence of treatment and the records showed plaintiff improved with treatment. The ALJ also stated that, "No treating or examining physician made any findings of functional limitation that were inconsistent with these opinions." (Tr. 28).

The ALJ made a number of missteps in weighing the medical opinions. First, he did not properly weigh Dr. Chandra's opinion. "An ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection." **Jelinek v. Astrue, 662 F.3d 805, 811 (7th Cir. 2011).**

The ALJ is required to consider a number of factors in weighing a treating doctor's opinion. The applicable regulation refers to a treating healthcare provider as a "treating source." The version of 20 C.F.R. §404.1527(d)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical

14

> impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added][4]

A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. ***Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).** Supportability and consistency are two important factors to be considered in weighing medical opinions. In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." ***Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).**

In weighing the medical opinions, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with his conclusion. ***Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).** While he is not required to mention every piece of evidence, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." ***Godbey v. Apfel*, 238 F.3d 803,**

---

[4] The Court cites to the version of 20 C.F.R. §§ 404.1527 that was in effect at the time of the ALJ's decision. The agency subsequently amended the regulation by removing paragraph (c) and redesignating paragraphs (d) through (f) as paragraphs (c) through (e). The revised rule became effective as of March 26, 2012. 77 Fed. Reg. at 10651, 10656–57 (2012).

**808 (7th Cir. 2000)**.

The ALJ's discussion of Dr. Chandra's opinion is inadequate. The ALJ relied heavily on the fact that Egyptian Health's records indicated that plaintiff improved with treatment. However, the fact that plaintiff improved with treatment must be viewed in the context of his illness. The Seventh Circuit has observed that "many of the Social Security Administration's administrative law judges seem poorly informed about mental illness." ***Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010).** That seems to be the case here. Plaintiff was diagnosed with schizophrenia, which the Egyptian Health records refer to as "a severe mental illness." The records indicate he was still hearing voices at the time of his discharge from Egyptian Health, a finding which indicates that, while he may have improved, he was still experiencing significant symptoms. Yet, the ALJ rejected Dr. Chandra's opinion because, in his view, the Egyptian Health records indicate that plaintiff was improved.

The ALJ also relied heavily on the fact that Mr. Garris was able to work part-time while he was undergoing treatment. He failed to account for the fact that, once Mr. Garris was no longer in treatment and no longer participating in the supportive employment program at Egyptian Health, he was fired from his job. In addition, the ALJ remarked several times that the record did not reflect much treatment. He failed to recognize that the treatment was limited because Mr. Garris was unable to return to Egyptian Health and Dr. Chandra after a state grant to Egyptian Health was discontinued. This was error. See, ***Garcia v. Colvin*, 741 F.3d 758, 761-762 (7th Cir. 2013).**

16

Most glaringly of all, the ALJ ignored the fact that Dr. Chandra's opinion was consistent with both of Dr. Warshauer's reports. Dr. Warshauer examined Mr. Garris twice at the request of the agency, and concluded both times that Mr. Garris heard voices and was actively hallucinating. Dr. Warshauer observed that plaintiff fidgeted constantly, could not sit still, and had an inappropriate affect. He suggested in both of his reports that Mr. Garris would not be competent to handle his benefits if his application were to be approved.

Dr. Warshauer was "an agency doctor [and] unlikely therefore to exaggerate an applicant's disability." **Garcia, supra, at 761.** Nevertheless, the ALJ gave his opinion little weight. "[R]ejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled . . . can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step." **Beardsley v. Colvin, ___ F.3d ___, 2014 WL 3361073, *4 (7th Cir. 2014).**

ALJ Craig did not give a good explanation for rejecting Dr. Warshauer's opinion. He explicitly evaluated the GAF scores assessed by Dr. Warshauer, but gave no indication of how he weighed Dr. Warshauer's opinion that Mr. Garris was actively hallucinating. He failed to explain how his RFC assessment took into account (or discounted) the psychologist's observations that Mr. Garris was constantly fidgeting, could not sit still, had an inappropriate affect and laughed inappropriately. Further, the ALJ (and the parties) apparently did not notice that at least one page of Dr. Warshauer's second report is missing from the record.

In addition, as plaintiff points out, the ALJ gave great weight to the opinions of the state agency consultants despite the fact that they evaluated plaintiff's RFC

17

based on a diagnosis of bipolar disorder, not schizophrenia. Mr. Garris was not diagnosed with bipolar disorder by any of the health care providers who treated or examined him. The state agency consultants gave no explanation for why they evaluated plaintiff based on bipolar disorder rather than schizophrenia. Defendant argues that the anomaly is inconsequential because Dr. Henson acknowledged that plaintiff had been diagnosed with schizophrenia. However, that is exactly the point. Because Dr. Henson gave no explanation, it is impossible for the ALJ or the Court to know why Dr. Henson apparently believed that plaintiff suffered from bipolar disorder rather than schizophrenia. And, the ALJ made no attempt to explain how an opinion based on a diagnosis of bipolar disorder could be entitled to great when the health care providers who treated and examined Mr. Garris agreed that he suffers from schizophrenia, and not bipolar disorder.

The ALJ is "required to build a logical bridge from the evidence to his conclusions." ***Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).** ALJ Craig simply failed to do so here. He did not adequately explain why he discounted the opinions of the treating and examining doctors, and gave great weight to the state agency consultants' opinions. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." ***Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).**, citing ***Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).**

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Garris is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any

18

opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Clarence L. Garris' application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

DATE: **August 7, 2014.**


<u>s/ Clifford J. Proud</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**